**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Alson C. Alston,<br><br>　　　　　　　Plaintiff,<br><br>　　　　– against –<br><br>Montgomery County Office of the District Attorney,<br>Kevin R. Steele, in his official capacity as Montgomery County<br>District Attorney,<br>Edward F. McCann Jr., in his official capacity as First Assistant<br>Montgomery County DA and in his individual capacity,<br>County of Chester, Pennsylvania,<br>Chester County Office of the District Attorney,<br>Deborah S. Ryan, in her former official capacity as Chester<br>County District Attorney and in her individual capacity,<br>Christopher de Barrena-Sarobe, in his official capacity as Chester<br>County District Attorney,<br>David M. Sassa, in his official capacity as Chester County Chief<br>of Detectives and in his individual capacity,<br>　　　　　　　Defendants. | Civil Action No.: 2:26-cv-2634<br><br>**Jury Trial Demanded** |

**VERIFIED COMPLAINT**

Plaintiff Alson C. Alston, by and through undersigned counsel, hereby submits this

Verified Complaint to state claims seeking redress for acts of discrimination and willful

misconduct committed by Defendants against Plaintiff and other African-American applicants

and/or applicants age 40 or older for Attorney I or II positions in Montgomery County and/or

Chester County, Pennsylvania.

1

## I. INTRODUCTION

This action arises from interviews for entry-level attorney positions with the Montgomery County Office of the District Attorney in Norristown, Pennsylvania, and the Chester County Office of the District Attorney in West Chester, Pennsylvania. Defendants Montgomery County employed at all relevant times fifteen (15) or more employees within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b), and twenty (20) or more employees within the meaning of the Age Discrimination in Employment Act, 29 U.S.C. § 630(b). Defendants Chester County and the Chester County Office of the District Attorney likewise employed at all relevant times fifteen (15) or more employees within the meaning of Title VII and twenty (20) or more employees within the meaning of the ADEA.

Plaintiff alleges that Defendants Ryan and McCann asked interview questions that were unrelated to the published job responsibilities or requirements, but were heavily and negatively correlated with race. Specifically, scientific evidence demonstrates that African-Americans would answer the challenged questions most negatively, while white applicants would answer them most favorably. McCann informed Ryan of the questions, and she asked Plaintiff the same questions. Ryan then caused Chester County to deny Plaintiff an interview for an Attorney I position in other county departments.

Alston had a 3.55 GPA in law school and was well-qualified for all of the positions at issue. Defendants subjected him to racially discriminatory questions for the purpose of eliminating him as a candidate because of their ongoing discrimination against African-Americans. The interview questions also were aimed at guessing his age, in violation of the ADEA, because age was not a job qualification and was not advertised as a requirement in any of the position announcements.

2

## II. THE PARTIES

17.    Plaintiff Alson C. Alston is a 61-year-old African-American attorney whose office is located at 2836 W. Girard Ave., Philadelphia, PA 19130.

18.    Defendant Montgomery County Office of the District Attorney is the primary law enforcement agency in Montgomery County, Pennsylvania. Its principal place of business is County Courthouse, 4th Floor, Norristown, PA 19404-0311, Phone: 610-278-3090.

19.    Defendant Kevin R. Steele is the District Attorney for Montgomery County, Pennsylvania and was in that capacity during all relevant times of the claims set forth herein. Alston was informed that Steele would conduct his second and final interview; however, in a departure from standard practice, Steele never interviewed Alston. His principal place of business is County Courthouse, 4th Floor, Norristown, PA 19404-0311, Phone: 610-278-3090. Steele is sued in his official capacity only.

20.    Defendant Edward F. McCann Jr. is the First Assistant to the Montgomery County District Attorney. He interviewed Alston during a follow-up panel after Alston had advanced through the first round of interviews. He was the only person from the Montgomery County DA's office who asked the discriminatory questions at issue. He did not ask about Alston's 3.55 GPA or other relevant qualifications for the Attorney I role. His principal place of business is County Courthouse, 4th Floor, Norristown, PA 19404-0311, Phone: 610-278-3090. McCann is sued in his official and individual capacities.

21.    Defendant County of Chester, Pennsylvania caused Plaintiff to be denied interviews for Attorney I positions in county departments other than the District Attorney's office, approximately two weeks after Defendant Ryan posed racially disparate and age-discriminatory questions to Plaintiff and caused the County to deny Plaintiff further consideration. Its principal

place of business is 201 W. Market St., Suite 4450, West Chester, PA 19382, Phone: 610-344-6801.

22.    Defendant Chester County Office of the District Attorney is the primary law enforcement agency in Chester County, Pennsylvania.

23.    Defendant Christopher de Barrena-Sarobe is the current District Attorney for Chester County, Pennsylvania and was not in that capacity during any of the relevant times of the claims set forth herein. He is sued in his official capacity only, by reason of his responsibility and accountability for the Chester County Office of the District Attorney. His principal place of business is 201 W. Market St., Suite 4450, West Chester, PA 19382, Phone: 610-344-6801.

24.    Defendant Deborah S. Ryan was the District Attorney for Chester County, Pennsylvania during all relevant times of the claims set forth herein. On January 6, 2020, before her interview with Alston, she fired a long-serving and respected African-American Chief of Detectives, Kevin Dykes, just three days before he would have qualified to retire and receive a pension. She permitted a white lieutenant to remain employed several months longer to qualify for his pension. She immediately thereafter hired Defendant Sassa, a white male who had no prior experience as a Chief of Detectives. Dykes sued Ryan for racial discrimination and recovered a $126,000 settlement. Ryan is sued in her former official and individual capacities. Her current place of business is Courtroom 3, 201 W. Market Street, West Chester, PA 19380-0991, Phone: 610-344-4473.

25.    Defendant David M. Sassa is a white male who is the current Chief of Detectives for Chester County and held that position during all relevant times of the claims set forth herein. He participated on the interview panel with Ryan that interviewed Plaintiff. Sassa was notable for snickering and laughing throughout Alston's interview and was the only panelist who did not

4

ask Alston a single question. Sassa had been appointed Chief of Detectives by Ryan prior to the Alston interview, after Ryan fired an experienced African-American Chief of Detectives just three days before that Chief's retirement. Sassa had no experience as a Chief of Detectives when Ryan appointed him. His current place of business is 201 W. Market St., Suite 4450, West Chester, PA 19382, Phone: 610-344-6801. Sassa is sued in his official and individual capacities.

## III. JURISDICTION

26.    Jurisdiction is proper under 28 U.S.C. § 1331 (federal question jurisdiction) because this action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq.; and 42 U.S.C. § 1981. Jurisdiction also exists under 28 U.S.C. § 1343(a)(1) and (4).

27.    Supplemental jurisdiction over Plaintiff's state-law claims is proper under 28 U.S.C. § 1367(a) because those claims arise from the same nucleus of operative facts as the federal claims and include violations of the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 951 et seq.

## IV. VENUE

28.    Venue in the Eastern District of Pennsylvania is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims herein occurred in this judicial district.

## V. ADMINISTRATIVE EXHAUSTION

29.       Plaintiff timely filed charges of discrimination with the Equal Employment Opportunity Commission (EEOC) against the relevant Defendants. Plaintiff's PHRA claims were dual-filed with the Pennsylvania Human Relations Commission (PHRC) as required by 43 P.S. § 959.  Plaintiff received Right-to-Sue Letters and brings this timely action within statutory deadlines. Plaintiff's Adninistrative Complaints and Right-to-Sue Letters are incorporated herein by reference as though fully set forth.

## VI. GOVERNING LEGAL FRAMEWORK

30.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., prohibits discrimination in employment on the basis of race, under theories of both disparate impact and disparate treatment.

31.     The Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., prohibits discrimination in employment against persons age 40 and older.

32.     The Pennsylvania Human Relations Act (PHRA), 43 P.S. § 951 et seq., prohibits discrimination in employment on the basis of race and age (40+) and generally follows the same legal standards as Title VII and the ADEA.

33.     42 U.S.C. § 1981 prohibits intentional race discrimination in the making and enforcement of contracts, including employment contracts. Section 1981 supports individual liability and does not require exhaustion of administrative remedies.

## VII. FACTUAL BACKGROUND

### A. Interviews with the Montgomery County Office of the District Attorney.

34.    Plaintiff saw a job posting for the Attorney I position with the Montgomery County Office of the District Attorney on its website. The stated qualifications included graduation from law school and being or expected to become a licensed attorney. No prior experience was required for the role, and there was no requirement that the applicant have passed the bar exam on his or her first attempt.

35.    Plaintiff met the stated qualifications.

36.    Plaintiff applied for an Assistant District Attorney position with the Montgomery County Office of the District Attorney in or around July 2023.

37.    Plaintiff is an African-American male and was 59 years old at the time of the application.

38.    Plaintiff has not received a response from Montgomery County advising him of its hiring determination.

39.    On Friday, July 14, 2023, within approximately one month after Plaintiff had applied, he was contacted by Brianna L. Ringwood, Deputy District Attorney, to schedule his first interview.

40.    On July 27, 2023, Plaintiff attended an in-person interview with four Assistant DAs or Deputy DAs, all of whom were Caucasian. During this interview, Plaintiff was asked about his experience in law school, his qualifications, and his interest in the position. All interviewers appeared genuinely interested in evaluating whether Plaintiff was qualified for the job and whether he had an interest in becoming an ADA. Plaintiff was made to feel welcome throughout the interview. He was informed afterward that he would be scheduled for a second

interview, which would most likely be conducted by DA Kevin R. Steele, because Steele liked to meet all candidates.

41. On August 16, 2023, Plaintiff was contacted by Kelly Lloyd, Deputy District Attorney, to schedule his second interview with "our 1st Assistant and our Chief of Trials," rather than with the District Attorney. She asked Plaintiff to come in the following day, acknowledging that the notice was short.

42. On August 17, 2023, Plaintiff attended this interview in person in the same conference room as his first interview. A panel of two supervisors was present: First Assistant Edward F. McCann Jr. (Caucasian, approximately 50–55 years of age) and another male supervisor (Caucasian, approximately 50 years of age).

43. Mr. McCann asked Plaintiff three discriminatory questions:

   a. "Did you pass the bar exam on your first attempt," a question that has a dramatically disparate impact on African-American applicants as set forth in the statistical evidence below;

   b. "When did you graduate from law school," which was an attempt to infer Plaintiff's age unlawfully; and

   c. "Where do you come from, where did you grow up," which sought to judge Plaintiff on racial stereotypes. Plaintiff's resume clearly stated that he was from Philadelphia, but did not specify which part of the city.

44. None of these questions was related to the posted job qualifications.

45. Plaintiff recalls that these three questions were the first three that McCann asked. Plaintiff became immediately uncomfortable. Within approximately one minute of arriving at the

interview, it was apparent that McCann had every intention of ensuring that Plaintiff would not advance in the process.

46.    This observation proved accurate. Plaintiff never received any further communication from Montgomery County advising him of its hiring determination, but at some point Plaintiff observed that the position for which he had interviewed was no longer posted on the County's website.

47.    Plaintiff alleges that he was denied hire based on his race and age in violation of Title VII of the Civil Rights Act of 1964, as amended, the ADEA, as amended, and 42 U.S.C. § 1981. He further alleges that he was asked about his age during the interview in violation of the ADEA.

### B. Interview with the Chester County Office of the District Attorney.

48.    Plaintiff saw a job posting for the Attorney I position with the Chester County Office of the District Attorney on its website in or about the summer or fall of 2023.

49.    The stated qualifications included graduation from law school and being or expected to become a licensed attorney. No prior experience as an attorney, geographic or other ties to Chester County, or first-attempt bar passage were required.

50.    Plaintiff met the stated qualifications.

51.    Plaintiff applied for an Attorney I position with the Chester County Office of the District Attorney in or about September 2023.

52.    Plaintiff is an African-American male and was 59 years old at the time of the application.

53.    At the invitation of Molly Donegan, Assistant to DA Ryan, Plaintiff attended an in-person interview with DA Ryan, Chief of Detectives David M. Sassa, and Acting First Assistant DA Andrea Cardamone, all of whom are Caucasian, on October 3, 2023.

54.    In this interview, Chester County DA Ryan asked Plaintiff essentially the same three discriminatory questions that McCann had asked, and they appeared clearly calculated to make Plaintiff uncomfortable. Ryan paused for an unusually long time after each such question to gauge Plaintiff's reaction:

a.  Ryan began by asking Plaintiff: "So, how did we get here, tell me about your background." This question was not job-related and sought to obtain information regarding stereotypes and assumptions related to the protected class of race. She also asked: "What are your ties to Chester County?" This question was not contained in the position description and was not job-related. Chester County is among the wealthiest counties in Pennsylvania and its population is approximately 89% white and 6% African-American. Asking an African-American applicant about his ties to a virtually all-white county is calculated to have a disparate impact on his comfort and responsiveness in an interview. Plaintiff immediately recognized in real time that these questions could only highlight his demographic differences from the typical Chester County resident and applicant, as well as from the attorneys already on staff. His academic background, community activism, and law-enforcement family history were extremely well-suited to the position, but the likely answers he could give to these questions would cause him to appear to be an outsider and a poor fit. All of this uncertainty impaired his ability to present himself effectively as the interview proceeded. Plaintiff perceived that causing his discomfort was the purpose of the questions.

b. When Ryan next asked, "When did you graduate from law school," Plaintiff immediately recognized this as an attempt to determine his age, which was not job-related. Ryan appeared visibly surprised, and indeed alarmed, when Plaintiff stated that he had strong ties to Chester County — specifically, that he had visited his Regional Manager in Paoli weekly when he owned a Subway franchise and had worked for Microsoft in Malvern for several years. Ryan remained absolutely silent after this response, as if to convey, falsely, that his answer was insufficient.

- o After approximately ten seconds of silence, Plaintiff added: "I also come to Chester County frequently to visit friends or to shop." Ryan remained silent and continued to look down at her papers. Plaintiff perceived that she was not succeeding in eliciting racially disparate comments from him and was biding her time.

- o Plaintiff then recalled and added: "I also come to Chester County for breakfast almost every day along West Chester Pike." Only then did Ryan and the other two interviewers react at all — laughing derisively and making jokes with each other at Plaintiff's expense, visibly elated that they believed they finally had something to criticize. Ryan said: "So, you come all the way from Philly to Chester County just for breakfast? That's hard to believe. Ha, Ha, Ha, Ha!"

- o Plaintiff explained that his family home is approximately one mile from City Line Avenue, which is just 15 to 20 minutes from Chester County, and that as a vegetarian, he tends to go to the same breakfast locations daily, which, ironically, are often McDonald's.

- o  The panel erupted into unrestrained laughter, wholly unconcerned that they were con-ducting themselves unprofessionally, after Plaintiff answered truthfully about his frequent trips to a Chester County restaurant for vegetarian breakfasts.

- o  Plaintiff's response was not humorous, and the laughter appeared forced, as though the panel was communicating: "Now, finally, we have something with which to criticize you."

- o  The panel was unable to stop laughing at Plaintiff's expense.

- o  It is unconscionable, in any professional setting, for interviewers to ridicule a candidate.

- o  Plaintiff perceived that the panel was going out of its way collectively to make him feel uncomfortable, and that the interview had been derailed by design. That the panel had nothing affirming to say about his franchise experience and actual employment history in Chester County, but immediately seized upon his response about breakfast, indicated to him that they were simply looking for anything to criticize, even if grounded only in ignorance or designed to produce racially disparate impacts

c.  Ryan then asked, sheepishly and without making eye contact: "Did you pass the bar exam on your first attempt?" The other two panelists stared intently at Plaintiff, having composed themselves, and were obviously waiting to observe his reaction, as if this moment had been planned in advance. Plaintiff was immediately placed on the defensive. He had believed Ryan was a sensible, reasonable person. He did not know at the time that she had recently settled a racial discrimination suit brought by African-American Chief of Detectives Kevin Dykes, whom she had fired just three days before he qualified for his pension, in favor of the smirking new Chief sitting directly across from Plaintiff. Plaintiff felt completely disarmed.

o Plaintiff told Ryan that he had not passed the bar exam on his first attempt because he could not study for the exam immediately after law school: he had no remaining financial aid, yet was still fully responsible for caring for his bedridden, seriously ill, elderly mother. "I had to work Lyft and Uber to provide for my family, so could not study at all."

o Plaintiff added that at a subsequent employer, half of his department was preparing to retake the bar exam and management provided time to prepare, because this served the employer's own business interests. Because he had employment and time to study, he passed the bar. Ryan had nothing constructive to say in response and instead offered a caustic, sarcastic remark: "That was nice of them!" Plaintiff responded that it was good business, not a nicety, because the employer could end up with new attorneys at the pay rate of paralegals, and it cost them nothing.

o Ryan and her panel did not ask Plaintiff about his 3.55 law school GPA or about the prizes he received for being the top student in two law school courses — both of which were obvious relevant considerations for a fair, qualification-focused interview.

55. Feeling completely disrespected as a result of the panel's forced, ostentatious, uproarious laughter and having been required to answer a humiliating question about bar passage on the first attempt, Plaintiff became reserved and answered the remaining interview questions in a guarded manner.

56. Little more than half of African-American law school graduates pass the bar on their first attempt, while approximately 80% of white graduates do. See Section VIII.D below.

57. Performance on bar examinations has little to do with intelligence, ability to reason, or ability to perform the work of a lawyer, but depends substantially on who can afford ex-

pensive preparation courses and who has few family demands in the two months following graduation from law school. See Section VIII.D below.

## C. Chester County Interview Denied Two Weeks After Chester Co. DA Interview.

58.     In addition to the position with the Chester County DA's office, Plaintiff also applied for Attorney I positions with the Chester County Public Defender's office and Court Administration department in or around September 2023.

59.     On October 19, 2023 — sixteen days after the DA's office interview — Chester County informed Plaintiff that he would not be interviewed for the other entry-level attorney positions for which he had applied. Plaintiff alleges, upon information and belief, that Ryan and/or her office conveyed their discriminatory assessments and negative impressions of Plaintiff to those other county departments, causing his exclusion from further consideration.

60.     Plaintiff alleges that he was denied hire and denied interviews based on his race and age in violation of Title VII, the ADEA, and 42 U.S.C. § 1981.

## D. Statistical Evidence & Research.

61.     In 2023, little more than half of African-American law school grads passed the bar on their first attempt, while about 80% of whites did, per Karen Sloan, *Racial Disparities in Bar Exam Scores Worsened in 2022*, REUTERS (April 12, 2023 2:18 PM EDT).

62.     Performance on bar exams has little to do with intelligence, ability to reason or ability to do the work of a lawyer, per Deborah Jones Merritt et al., *Racial Disparities in Bar Exam Results—Causes and Remedies*, REUTERS (July 20, 2021, 4:00 AM EDT).  They concluded that: "Candidates who can afford to study full-time for two months after law school, who can purchase expensive prep courses, and who have few family demands are most likely to pass the

exam. Given racial disparities in family resources, the exam's disparate racial impact is predictable." *Id.*

63.     The question regarding first-attempt bar passage was also improper because it is inconsistent with EEOC guidance in Section 15 -- Race and Color Discrimination. *See* https://www.eeoc.gov/laws/guidance/.

## VIII. CAUSES OF ACTION

### COUNT I -
### Title VII Race Discrimination — Disparate Impact
### 42 U.S.C. § 2000e et seq. and PHRA
### *Against All Defendants.*

64.     Plaintiff incorporates all prior paragraphs by reference as though fully set forth herein. Plaintiff also incorporates by reference his EEOC and dual filed PHRC Complaints and Right-to-Sue Letters as though fully set forth herein.

### A. Legal Framework and Standard

65.     **To establish a disparate impact claim under Title VII, Plaintiff must prove:**:

   a.   **Identification**: A specific, facially neutral employment practice -- here, the specific interview **questions at issue.**

   b.   **Causation**/Disparity: That these questions have a significant adverse impact on African-American applicants compared to others.

   c.   **Statistical Evidence**: Typically, statistical data showing that use of the challenged questions results in a selection rate for African-Americans that is significantly lower than the rate for white applicants, often evaluated using the "four-fifths rule."

66.    **The Burden Shift:** If Plaintiff proves the adverse impact, the employer must demonstrate that the challenged questions are "job-related for the position in question and consistent with business necessity."

## B. Application of Legal Framework

67.    Plaintiff incorporates all prior paragraphs by reference as though fully set forth herein. Plaintiff also incorporates by reference his EEOC Complaints and Right-to-Sue Letters as though fully set forth herein.

68.    The specific facially neutral employment practices at issue were the interview questions used by Defendants McCann and Ryan during the Montgomery County and Chester County Attorney I hiring processes, including: whether Plaintiff passed the bar examination on his first attempt, when he graduated from law school, where he came from or grew up, how he "got here," and what ties he had to Chester County. Plaintiff alleges these questions were not listed in the job postings, were unrelated to the posted qualifications, and were used in interviews for entry-level attorney positions for which Plaintiff otherwise met the stated requirements.

69.    Plaintiff further alleges that these interview questions had a disparate adverse impact on African-American applicants because they were designed to elicit answers tied to race, neighborhood background, outsider status, and bar examination outcomes that fall more harshly on African-American candidates than on white applicants. The question whether Plaintiff passed the bar on his first attempt has a disparate impact on African-American applicants: in 2023, little more than half of African-American law graduates passed the bar on their first attempt, while approximately 80% of white graduates did. The "where do you come from," "where did you grow up," "tell me about your background," and "what are your ties to Chester County" ques-

16

tions were calculated to expose demographic differences from the typical white Chester County applicant and resident population and to make Plaintiff appear to be an outsider.

70.    Plaintiff pleads causation. His first Montgomery County interview was welcoming and focused on qualifications; he was told he would likely advance. The discriminatory questions first appeared in the second interview with McCann, after which Plaintiff received no further communication and the position disappeared from the website. Ryan asked materially the same discriminatory questions at the Chester County interview; the panelists laughed at Plaintiff's answers and treated him as an outsider; and shortly thereafter Plaintiff was denied further interviews for other Chester County entry-level attorney positions. These facts, if accepted as true, support Plaintiff's claim that the challenged interview practices adversely affected his candidacy.

71.    Plaintiff alleges that the challenged questions were not job-related and were not consistent with business necessity. The published qualifications required only graduation from law school and licensure or expected licensure — not first-attempt bar passage, not a particular age or graduation year, and not county ties or a particular personal background. Defendants used screening criteria that were unnecessary to the Attorney I positions yet operated to disadvantage African-American applicants, including Plaintiff.

72.    The PHRA claim under this Count follows the same standards as Title VII and is pleaded on the same facts. Plaintiff has exhausted his administrative remedies by dual-filing with the PHRC.

## COUNT II -
### Title VII Race Discrimination — Disparate Treatment
### 42 U.S.C. § 2000e et seq. and PHRA
### *Against All Defendants.*

73.     Plaintiff incorporates all prior paragraphs by reference as though fully set forth herein.

## A. Legal Framework and Standard

74.     To establish a disparate treatment claim under Title VII, Plaintiff must prove: (a) membership in a protected class; (b) qualification for the position; (c) an adverse employment action; and (d) circumstances giving rise to an inference of intentional discrimination, including, but not limited to, the treatment of similarly situated persons outside the protected class.

75.     Once Plaintiff establishes a prima facie case, the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for their actions. Plaintiff may then demonstrate that the stated reason is false or pretextual and that intentional race discrimination was the true motivation.

## B. Application of Legal Framework

76.     Plaintiff is an African-American male and therefore a member of a protected class under Title VII. He met the posted qualifications for the Attorney I positions at issue. He suffered adverse employment actions in that he was not advanced after the second Montgomery County interview, was denied hire by the Chester County DA's office, and was denied interviews by other Chester County departments for which he had applied.

77.     The circumstances of both interviews give rise to a strong inference of intentional race discrimination. McCann and Ryan asked Plaintiff materially identical questions that were

18

not listed in the job postings and were not job-related — questions designed to elicit race-correlated responses and to cause Plaintiff discomfort. Ryan had, just before the Alston interview, fired an experienced African-American Chief of Detectives three days before his pension vested, while allowing a white employee in the same office to remain long enough to qualify for his pension. She replaced that African-American Chief with Defendant Sassa, a white male with no prior experience as a Chief of Detectives, who then sat on the panel that interviewed Plaintiff and snickered and laughed throughout the interview without asking a single question. Ryan settled Dykes's resulting racial discrimination lawsuit for $126,000 — a pattern of conduct that is directly relevant to her state of mind when interviewing Plaintiff.

78.     The coordination of the discriminatory questioning between McCann (Montgomery County) and Ryan (Chester County) — asking Plaintiff virtually identical questions — supports an inference that the discriminatory screening was deliberate and coordinated rather than coincidental.

79.     The panel's sustained, derisive laughter in response to Plaintiff's truthful answers about his genuine ties to Chester County, combined with the panel's complete failure to ask about Plaintiff's 3.55 GPA or academic distinctions, evidences that the interviewers were not genuinely evaluating Plaintiff's qualifications but were seeking pretexts for exclusion.

80.     The PHRA claim under this Count follows the same standards as Title VII and is pleaded on the same facts. Plaintiff has exhausted his administrative remedies by dual-filing with the PHRC.

## COUNT III -
### Age Discrimination — ADEA and PHRA
### 29 U.S.C. § 621 et seq. and 43 P.S. § 951 et seq.
*Against All Defendants.*

81.    Plaintiff incorporates all prior paragraphs by reference as though fully set forth herein. Plaintiff also incorporates by reference his EEOC and dual filed PHRC Complaints and Right-to-Sue Letters as though fully set forth herein.

## A. Legal Framework and Standard

82.    The ADEA prohibits an employer from refusing to hire, failing to hire, or otherwise discriminating against an individual with respect to employment because that individual is 40 years of age or older.

83.    Plaintiff must prove: (a) membership in the protected class — age 40 or older; (b) qualification for the position at issue; (c) an adverse employment action; and (d) that age was the but-for cause of the adverse action, or at minimum a determinative factor in the hiring decision.

84.    Where, as here, Plaintiff challenges age-probing interview questions and age-based screening conduct, Plaintiff further alleges that: (a) Defendants used interview questions that directly or indirectly sought to identify Plaintiff's age, including when he graduated from law school; (b) such questions were not contained in the job posting and were not job-related; (c) Defendants used those questions and the resulting answers to assess Plaintiff unfavorably on the basis of age; and (d) Plaintiff was thereafter denied advancement, denied hire, denied interviews, or otherwise excluded from further employment consideration.

85.    **Burden Shift**: Once Plaintiff establishes a prima facie case, Defendants must articulate a legitimate, nondiscriminatory reason for their actions. Plaintiff may then show that

such reason is false, pretextual, or not the real reason and that age discrimination was the true reason for the adverse action.

## B. Application of Legal Framework

86.    Plaintiff incorporates all prior paragraphs by reference as though fully set forth herein. Plaintiff also incorporates by reference his EEOC Complaints and Right-to-Sue Letters as though fully set forth herein.

87.    Plaintiff was 59 years old when he applied for and was interviewed for the Attorney I positions at issue and is therefore a member of the protected class under the ADEA. He met all posted qualifications for the positions. He suffered adverse employment actions as described in the preceding counts.

88.    Plaintiff alleges that Defendants used specific interview questions and hiring practices that adversely affected him because of age and that were designed to identify his age indirectly. McCann asked: "When did you graduate from law school," and Ryan later asked the same question — both for the purpose of inferring Plaintiff's age, even though age was not a posted qualification for the Attorney I positions and the postings required only law-school graduation and licensure or expected licensure, not recency of graduation.

89.    The question "Did you pass the bar exam on your first attempt?" had an age-related screening effect because it invited Defendants to make judgments tied to the timing of Plaintiff's legal education, licensing path, and career history, rather than his qualifications for the entry-level attorney role. The question was not job-related under the posted criteria. Plaintiff was compelled to explain that he had not passed on the first attempt because he lacked resources immediately after law school and was caring for his bedridden, elderly mother while working to

support his family. This line of questioning immediately placed Plaintiff on the defensive and contributed to his rejection.

90.    Plaintiff pleads causation: after these age-probing questions were asked, he did not advance in the Montgomery County process and was denied interviews or further consideration in Chester County. On these facts, Plaintiff pleads that Defendants used facially neutral questioning and selection practices to disadvantage older applicants, including Plaintiff, even though age was not relevant to the posted job requirements.

91.    Plaintiff alleges that the challenged interview practices were neither job-related nor consistent with business necessity, and instead functioned as tools to identify and disfavor older applicants.

92.    The PHRA age-discrimination claim under this Count follows the same standards as the ADEA and is pleaded on the same facts. Plaintiff has exhausted his administrative remedies by dual-filing with the PHRC.

## COUNT IV -
### Race Discrimination — Intentional Discrimination
### 42 U.S.C. § 1981
### Against Defendants McCann, Ryan, and Sassa in Their Individual Capacities, and Against the Montgomery County and Chester County Entity Defendants.

93.    Plaintiff incorporates all prior paragraphs by reference as though fully set forth herein.

## A. Legal Framework and Standard

94.    42 U.S.C. § 1981 provides that all persons within the jurisdiction of the United States shall have the same right to make and enforce contracts as is enjoyed by white citizens.

22

The right to make and enforce contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. Employment is a contractual relationship within the meaning of § 1981.

95.    Section 1981 requires proof of purposeful, intentional discrimination on the basis of race. It supports individual liability against supervisors and employees who are personally involved in the discriminatory conduct, and does not require the exhaustion of administrative remedies.

96.    To establish a claim under § 1981, Plaintiff must prove: (a) that Plaintiff is a member of a racial minority; (b) that Defendants intentionally discriminated against Plaintiff on the basis of race; and (c) that the discrimination concerned one or more of the activities enumerated in the statute, including the making of an employment contract.

97.    Once Plaintiff establishes purposeful discrimination, the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for their conduct. Plaintiff may then demonstrate that the proffered reason is pretextual and that intentional race discrimination was the true motivation.

## B. Application of Legal Framework

98.    Plaintiff is an African-American male and therefore a member of a racial minority within the meaning of 42 U.S.C. § 1981. He applied for, and sought to enter into, employment contracts with the Montgomery County Office of the District Attorney and the Chester County Office of the District Attorney.

99.    Plaintiff alleges that Defendants McCann, Ryan, and Sassa individually, intentionally, and purposefully discriminated against him on the basis of race in connection with the hiring process for Attorney I positions. Specifically: (a) McCann personally posed racially discriminatory, non-job-related interview questions to Plaintiff designed to elicit race-correlated responses and to exclude him from further consideration; (b) Ryan personally posed materially identical racially discriminatory questions, coordinated those questions with McCann across county lines, caused her panel to engage in sustained, derisive, racially motivated laughter at Plaintiff's truthful responses, and caused Chester County's other departments to deny Plaintiff further interviews; and (c) Sassa participated in the Chester County interview panel, smirking and laughing throughout the interview, without asking Plaintiff a single question, in a manner consistent with the panel's racially hostile posture and designed to intimidate and demean Plaintiff.

100.    The following facts, taken together, establish intentional race discrimination within the meaning of § 1981: (a) the coordination of identical discriminatory questions across two separate county DA offices; (b) Ryan's established pattern of racial discrimination against African-American professionals, evidenced by the $126,000 Dykes settlement arising from her termination of an experienced African-American Chief of Detectives three days before his pension vested, followed by the immediate appointment of Sassa — a white male with no relevant experience — to the same position; (c) Sassa's presence on the panel in the role Ryan created for him by displacing an African-American, his failure to ask any substantive questions, and his visible derision during Plaintiff's interview; (d) the panel's failure to inquire about Plaintiff's 3.55 GPA or academic distinctions — affirmative evidence that qualifications were irrelevant to the panel's

24

purpose; and (e) the temporal proximity of the Chester County DA interview and the denial of interviews by other Chester County departments sixteen days later.

101.    These intentional acts directly prevented Plaintiff from making and enjoying employment contracts with the Montgomery County and Chester County Defendants, and caused Plaintiff economic harm, reputational harm, and emotional distress.

## IX. CONSOLIDATED PRAYER FOR RELIEF

102.    WHEREFORE, Plaintiff respectfully requests judgment in his favor and against all Defendants, jointly and severally, awarding:

a.   Declaratory relief that Defendants violated Title VII, the PHRA, the ADEA, and 42 U.S.C. § 1981.

b.   Actual damages, including back pay, front pay, and compensation for emotional distress.

c.   Punitive damages against the individual Defendants under 42 U.S.C. § 1981 to the extent permitted by law.

d.   Permanent injunctive relief requiring Defendants to publish the demographic categories of each applicant and the applicant selected for each position (without identifying information) and to refrain from using interview questions or screening criteria that are not listed as job qualifications in position announcements.

e.   Reasonable attorneys' fees and costs under Title VII, the PHRA, 42 U.S.C. § 1981, and any other applicable law.

f.   Such other and further relief as the Court deems just and proper.

**VERIFICATION**

I declare under penalty of perjury that the factual statements made in this Verified

Complaint are true and correct based on my personal knowledge, and where stated on

information and belief, I believe them to be true.

/s/ Alson C. Alston

Alson C. Alston

April 21, 2026


Respectfully submitted,

Dated: April 21, 2026          By:       /s/ Alson Clayton Alston, Esq.
                                         Alson Clayton Alston, Esq.
                                         2836 W. Girard Avenue
                                         Philadelphia, PA 19130
                                         Phone: 610-803-7124
                                         ACAlstonLaw@protonmail.com
                                         Attorney for the Plaintiff
                                         PA Bar Id: 333339